UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

MIGUEL RAMIREZ,

                 Plaintiff,　　　　　　　08 Civ. 3021

    -against-　　　　　　　　　　　　OPINION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

------------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/3/09

        Pro Se

        Miguel Ramirez
        353 Ft. Washington Avenue, #3B
        New York, NY 10033


        Attorneys for Defendant

        LEV L. DASSIN
        Acting United States Attorney for the
          Southern District of New York
        86 Chambers Street, 3rd Floor
        New York, NY 10007
        By:  Susan D. Baird, Esq.
             Assistant U.S. Attorney

**Sweet, D.J.**

Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), has moved under Rule 12(c), Fed. R. Civ. P., for judgment on the pleadings to dismiss the action of the plaintiff, Miguel Ramirez ("Ramirez" or the "Plaintiff"), pro se, seeking a review of the Commissioner's decision denying Ramirez Supplemental Security Income ("SSI") benefits under the Social Security Act (the "Act").

Upon the findings and conclusions set forth below, the motion is granted and the Commissioner's decision is affirmed.

## I.  PRIOR PROCEEDINGS

Plaintiff filed his application for SSI benefits on May 18, 2006, alleging that he had been disabled since January 1, 2004, due to a history of a brain aneurysm, possible organic brain syndrome ("OBS"), headaches, and hypertension. The application was denied, and Plaintiff requested a hearing. On September 26, 2007, an administrative hearing was held before Administrative Law

Judge Kenneth G. Levin (the "ALJ"). On October 3, 2007, the ALJ issued a decision finding that Plaintiff was not disabled, and the Appeals Council denied review on January 25, 2008.

Plaintiff filed his complaint in this Court against the Commissioner on March 25, 2008. The instant motion to dismiss was filed on September 26, 2008, and marked fully submitted on October 29, 2008.

**II.  THE FACTS**

The facts are set forth in the administrative record and the Commissioner's Memorandum of Law and are substantially unopposed.  Ramirez has submitted an affidavit reiterating his claim that he is disabled and that the record substantiates his disability claim.

**A.  Medical Evidence**

St. Luke's Roosevelt Hospital

From August 2005 through February 2007, Plaintiff was treated at St. Luke's Roosevelt Hospital ("Roosevelt

2

Hospital") both as an inpatient and for outpatient
services. In August 2005, Plaintiff complained of an
eight-day history of progressive headaches. It was
determined that Ramirez had a cerebral aneurysm, and on
August 8, 2005, he underwent surgery to remove the aneurysm
at Roosevelt Hospital.

Following the surgery, on August 30, 2005,
Plaintiff's neurosurgeon, Dr. Yasunari Niimi ("Dr. Niimi"),
examined Plaintiff. He reported that Plaintiff was doing
well with mild headaches for which he was taking Advil and
was neurologically intact. Dr. Niimi advised Plaintiff
that he could start working again, gradually increasing his
activity level.

On January 24, 2006, Dr. Niimi again reported
that Plaintiff was doing very well, while complaining of
minor headaches, and noted that he had not yet resumed his
work as a painter.

On March 29, 2006, Plaintiff was seen at
Roosevelt Hospital for a seven month post-surgery femoral
cerebral angiogram. Dr. Niimi again described Plaintiff as
grossly intact neurologically. The angiogram was described

3

as mostly unremarkable, except for the small remaining neck

remnant of the aneurysm which had grown by 1 millimeter and

mild recanalization due to coil compaction. According to

Dr. Niimi, Plaintiff was neurologically unchanged after

surgery.

Based upon the angiogram results, it was decided

that Plaintiff should undergo a second surgery to remove

the residual aneurysm. Ramirez was to have a surgical

consultation with Dr. David Langer ("Dr. Langer"), a

vascular neurosurgeon. On May 11, 2006, Dr. Langer

examined Plaintiff. During the examination, Ramirez

complained of some left-sided numbness, occasional right

leg pain, and fatigue. Dr. Langer's neurological

evaluation was essentially normal, and he found no evidence

of memory loss or cognitive deficits.

On May 17, 2006, a magnetic resonance image

("MRI") of Plaintiff's brain revealed no acute hemorrhage

or infarction, but did show what was thought to be the

aneurysm. Chest X-rays on July 17, 2006, and July 27,

2006, were unremarkable.

4

On July 18, 2006, Ramirez was seen at the
Roosevelt outpatient clinic, where he complained of some
left-sided numbness and occasion right leg pain.  His
physical examination was essentially normal, and he was
alert and oriented with full strength and normal reflexes.

Plaintiff underwent surgery on July 28, 2006, and
appeared to be neurologically stable post-surgery.  A CT
scan of his head on July 29, 2006, revealed post operative
changes and the placement of an aneurysm clip.

On July 31, 2006, Ramirez was examined and was
again found to be stable, alert, and fully oriented.  He
exhibited full strength throughout, and his cranial nerves
were intact.  Blood pressure was reported as 136/92, and a
cerebral angiogram plus endovascular coiling for residuals
was performed on July 31, 2006.  The left common and left
internal carotid arteries were selectively catheterized,
the aneurysm had complete occlusion, and no significant
abnormalities were detected.  On August 1, 2006, a lower
extremity vein Doppler study revealed evidence of deep vein
thrombosis.

From August 2 to 8, 2008, Plaintiff was treated at Roosevelt Hospital for suspected meningitis.

On August 23, 2006, Dr. Langer examined Plaintiff and noted that he was doing well with mild residual headaches. Dr. Langer reported that Ramirez had been readmitted after the aneurysm clipping due to aseptic meningitis, and further reported that Plaintiff had completed his treatment, that his headaches had significantly resolved, and that he only had some intermittent pain remaining. Dr. Langer stated that Ramirez's complaints were consistent with aseptic meningitis, and opined that Plaintiff's recovery had gone well.

On December 29, 2006, Dr. Langer again examined Plaintiff and assessed that Ramirez was doing beautifully and had no residual deficits. Ramirez reportedly took Ibuprofen for pain and Norvasc for hypertension, and was to be seen only on an annual basis thereafter. Dr. Langer encouraged Plaintiff to return to work.

At his next appointment, Dr. Niimi reported on February 6, 2007, that Plaintiff was doing well and that

the post-surgical angiogram showed complete occlusion of
the aneurysm.  According to Dr. Niimi, Plaintiff had no
neurological problems and reported only occasional
headaches.

### Dr. Virgilio Valdez

The administrative record also contains medical
records of Plaintiff's treatment by Dr. Virgilio Valdez
("Dr. Valdez") during the period November 2005 through July
2006.  On November 29, 2005, Ramirez saw Dr. Valdez and
complained of pain in the back of his left thigh,
especially when walking.  An examination revealed focal
pain in the mid-portion of the Plaintiff's left thigh.
Blood pressure was recorded at 130/80 and Naprosyn was
prescribed.

Plaintiff visited Dr. Valdez again on February
28, 2006, because he needed a physical examination before
having his angiogram.  Dr. Valdez described Plaintiff as
asymptomatic.  An electrocardiogram revealed a fast
heartbeat, but was otherwise normal.  Ramirez's blood
pressure had remained the same, and examination of the
extremities revealed normal results.

7

At a May 5, 2006 visit with Dr. Valdez, Plaintiff
complained of numbness in his left upper extremity with
mild pain.

Dr. Valdez completed a report on July 3, 2006, in
which he stated that he had treated Plaintiff since 1986
and that he had last seen Plaintiff on May 5, 2006, at
which time Plaintiff's blood pressure was 130/80.  The
report described Plaintiff's diagnoses as controlled
hypertension, status post-surgery for aneurysm, and a one
centimeter communication aneurysm with significant
complications and residuals of headache, leg pain,
numbness, and weakness/fatigue.[1]  Dr. Valdez did not respond
to questions regarding Plaintiff's reflexes, cranial
nerves, or motor strength.

### Dr. Felix Florimon

Ramirez was treated by Dr. Felix Florimon ("Dr.
Florimon"), his family physician, from September 2006 to
August 2007.  At his September 18, 2006 visit with Dr.
Florimon, Plaintiff complained of severe leg pain.  His

---

[1] As described above, the aneurysm was removed on July 28, 2006.

blood pressure was 150/100, and Dr. Florimon's physical examination was basically normal, with an assessment of polyurea and left leg pain.

When seen by Dr. Florimon on November 29, 2006, Plaintiff reported back pain which radiated to his left leg. His blood pressure was 140/90, and except for back tenderness, the clinical findings were unremarkable. X-rays of Plaintiff's pelvis on November 30, 2006, were also unremarkable. X-rays of the lumbar spine revealed no acute fracture, but showed a loss of disc height at L4-5 and L5-S1, which was suggestive of disc disease. There was also mild to moderate osteophyte formation in the thoracolumbar spine, but no spondyliosthesis or spondylolysis present.

Dr. Florimon completed a report on August 14, 2007, in which he wrote that Plaintiff's diagnoses were hypertension, back pain, and a history of brain surgery. He also stated that Plaintiff complained of severe low back and left leg and knee pain, severe headaches, inability to concentrate and focus, and forgetfulness. The doctor noted that Plaintiff had responded well to surgery, that his physical examination of Plaintiff was normal, and that Plaintiff's blood pressure was 132/90.

## Dr. Kautilya Puri

On September 22, 2006, Plaintiff was examined by
Dr. Kautilya Puri ("Dr. Puri"), a consulting neurologist.
Upon examination, Dr. Puri noted Plaintiff's scars from
surgery and blood pressure of 140/90. Plaintiff's gait and
station and fine motor activity were described as normal.
Ramirez was able to heel and toe walk, get on and off the
exam table, and rise from a chair without difficulty and
without use of an assistive device. Dr. Puri also reported
that Ramirez was fully oriented and had mild deficits in
recent and remote memory. Plaintiff's strength was fully
at 5/5 throughout, and there was no muscle atrophy
reported. The sensory examination was normal, and Dr. Puri
opined that Plaintiff did not have any objective functional
limitations.

## Dr. Herbert Meadow

Ramirez was also examined by Dr. Herbert Meadow
("Dr. Meadow"), a consulting psychiatrist, on November 1,
2006. Plaintiff's main complaint was forgetfulness, and he
also reported reduced appetite and poor sleep. The mental

10

status examination revealed that Plaintiff was fully
oriented with no evident thought disorder. Dr. Meadow
reported mild memory deficits and occasional word-finding
problems, a poor fund of information, and one-in-three
recall. He also stated that Plaintiff reversed digits and
could not subtract or add. Dr. Meadow stated that
Plaintiff might have trouble working due to memory
deficits, and he diagnosed Ramirez with OBS following brain
surgery and a learning disability.

### Dr. C. Richard Nobel

On November 8, 2006, Dr. C. Richard Nobel ("Dr.
Nobel"), a state agency review physician who reviewed
Plaintiff's file and observed his testimony, assessed that
Plaintiff had mild limitations in the activities of daily
living and in maintaining social functions, and had
moderate limitations in maintaining concentration,
persistence, and pace. Specifically, Dr. Nobel stated that
Plaintiff was not significantly limited in his ability to:
1) remember locations and work-like procedures; 2)
understand, remember, and carry out very short and simple
instructions; 3) maintain attention and concentration for
extended periods; 4) perform activities within a schedule,

11

maintain attendance, and be punctual within customary
tolerances; 5) make simple work-related decisions; 6)
interact appropriately with the general public; 7) ask
simple questions or request assistance; 8) maintain
socially appropriate behavior and to adhere to basic
standards of neatness and cleanliness; 9) be aware of
normal hazards and take appropriate precautions; 10) travel
in unfamiliar places or use public transportation; and 11)
set realistic goals or make plans independently of others.

Dr. Nobel further opined that Plaintiff was
moderately limited in his ability to: 1) understand,
remember, and carry out detailed instructions; 2) sustain
an ordinary routine without special supervision; 3) work in
coordination with or proximity to others without being
distracted by them, 4) accept instructions and respond to
criticism from supervisors, get along with coworkers or
peers without distracting them or exhibiting behavioral
extremes; and 5) respond appropriately to changes in the
work setting.

#### Dr. Warren Cohen

12

Dr. Warren Cohen ("Dr. Cohen"), a neurologist, testified at the administrative hearing as a medical advisor. He reviewed the medical evidence of record and heard Plaintiff's testimony. Dr. Cohen testified that Plaintiff had a history of cerebral aneurysm and had had two surgeries, the first of which removed 85 percent of the aneurysm, and the second of which removed the remainder. According to Dr. Cohen, the surgeries were successful, and it was not unusual for individuals with such a history to complain of headaches. Dr. Cohen stated that Plaintiff's allegation of vertigo at the hearing did not appear in the medical record, that Plaintiff had not been evaluated medically for that complaint, and that the allegation of vertigo was not medically connected to Plaintiff's aneurysm.

Dr. Cohen also noted Plaintiff's complaints of back pain, and stated that X-rays in the fall of 2006 showed degenerative disease of the spine. However, according to Dr. Cohen, the records did not show any clinical or diagnostic evidence of radiculopathy. Dr. Cohen specifically noted that there were a number of neurological examinations in the record and that each examination was normal and did not document any sensory

13

abnormality, reflex deficit, or weakness that would be indicative of radiculopathy.

According to Dr. Cohen, Plaintiff did not meet the requirements for any listed impairment for a continuous 12-month period. He concluded that Plaintiff had mild functional limitations, and would be restricted from lifting more than ten pounds frequently and twenty pounds occasionally. Dr. Cohen assessed that Plaintiff could stand, walk, or sit up for up to six hours a workday and could occasionally kneel, crouch, and crawl. Dr. Cohen also stated that Plaintiff should avoid heights, hazards, scaffolds, and ladders.

## B. **Non-Medical Evidence**

Ramirez was born in the Dominican Republic in 1947, and attended school through the second grade. He came to the United States in 1979, but is not currently a U.S. citizen. He testified that he can read and write some Spanish, and understand a little English. At the September 2007 hearing, Plaintiff testified that he was divorced and had lived alone until he moved in with his son in July 2007.

14

Plaintiff reported that due to his surgeries, he was unable to lift heavy items and that he got dizzy when he stood too long. He stated that those conditions first bothered him in July 2005, but claimed that he became unable to work due to those conditions in January 2004. He went on to state that he stopped working in January 2004 because the restaurant where he was employed closed and he lost his job. In another report to SSA, Ramirez stated that he became unable to work on July 25, 2005, due to an aneurysm.

In the past, Ramirez has been employed at a car wash, a bodega, and as a house painter. He stated that his longest job was working at a car wash, where he worked for about three years. As part of his job at the car wash, Plaintiff stated that he washed and cleaned cars, put things away, and lifted and carried detergents weighing forty to fifty pounds. His two-year job in the bodega required him to stock shelves, help customers with groceries, and clean the store. At the bodega, Plaintiff reportedly lifted twenty-five pounds frequently and sometimes lifted fifty pounds. Ramirez stated that he worked as a house painter for approximately two years.

15

Plaintiff had no reported earnings from 1969 to 1978, or
from 2004 onward.

In October 2006, Ramirez reported that he had
fifteen headaches each month which he identified as "sixes"
on a scale of one to ten. Plaintiff further stated that
until he moved in with his son, he had handled all his own
household chores, and that since living with his son,
Plaintiff did some light cooking, cleaned his part of the
apartment, and did light shopping. He stated that he was
able to walk five blocks and could use public transit.
Ramirez testified that he spent his time taking walks with
his son, talking to friends, and watching television.
Three times each month he walked four blocks to church for
hour-long services.

Plaintiff further testified that after his last
surgery, he began having dizzy spells three to four times
per week for periods of fifteen to twenty minutes. He
stated that his doctors did not prescribe any medication
for the dizziness. He also reported up to five headaches
each week, each of which lasted two to three hours.
Plaintiff stated that he used Ibuprofen and Naprosyn for
the pain, which did provide some relief. Ramirez also

16

testified that he had low back pain which radiated down his left leg to his calf and heel.

According to Plaintiff's testimony, he could stand for fifteen to twenty minutes continuously and sit for approximately thirty minutes continuously. He stated that until July 2007, he had lived in a second floor walk-up apartment, and since then lived in a building with an elevator. He testified that he could walk for two to three blocks, and although he was "supposed" to use a cane, he preferred not to. Ramirez further testified that he was able to lift and carry twenty to twenty-five pounds and to use public transit subways and buses.

### Evidence from Plaintiff's Relatives

Plaintiff's son, Arnold Ramirez, reported that his father had headaches four or five times per week and was fatigued. Maria Ramirez, identified as Plaintiff's wife, stated that Plaintiff had severe headaches every day and was unable to go anywhere or do anything. She also stated that Plaintiff got dizzy and forgot things, but was able to perform the activities of daily living.

17

Vocational Expert Testimony

Melinda Fass-Karlin ("Fass-Karlin") testified at
the hearing as a vocational expert.  After listening to
Plaintiff's testimony and reviewing the vocational record,
Fass-Karlin testified that Plaintiff's past work as a car
wash attendant was light, unskilled work, and as performed
by Plaintiff, it was performed at the medium exertional
level.  Fass-Karlin further testified that the car wash
attendant job did not require more than occasional kneeling
and crawling and did not involve unprotected heights,
ladders, scaffolds, or dangerous machinery.

Fass-Karlin testified that Plaintiff's grocery
clerk job was akin to a warehouse worker job and described
both the grocery job and the house-painter job as medium,
unskilled work.

**III.  DISCUSSION**

**A.   Standard of Review**

The Social Security Act provides that the
"findings of the Commissioner . . . as to any fact, if

18

supported by substantial evidence, shall be conclusive . .
. ." 42 U.S.C. § 405(g); see Richardson v. Perales, 402
U.S. 389, 401 (1971); Perez v. Chater, 77 F.3d 41, 46 (2d
Cir. 1996). Substantial evidence means "more than a mere
scintilla. It means such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion."
Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v.
NLRB, 305 U.S. 197, 229 (1938)); Halloran v. Barnhart, 362
F.3d 28, 31 (2d Cir. 2004). "The substantial evidence test
applies to the inferences and conclusions drawn from basic
evidentiary facts as well as the facts themselves." Murphy
v. Sec'y of HHS, 62 F. Supp. 2d 1104, 1106 (S.D.N.Y. 1999)
(citation omitted).

In assessing whether the evidence supporting the
Commissioner's position is substantial, the Court does "not
look at that evidence in isolation but rather will view it
in light of other evidence that detracts from it." Alston
v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) (internal
quotations and citation omitted). However, if the Court
finds that there is substantial evidence supporting the
Commissioner's determination, the Commissioner's decision
must be upheld, even if there is also substantial evidence
for the plaintiff's position. Id.

19

## B. **Plaintiff's Burden Under the Act**

In order to establish disability under the Act, a claimant has the burden of establishing that he or she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," 42 U.S.C. § 1382c(a)(3)(A), and the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner's regulations prescribe a five-step procedure for evaluating disability claims. See 20 C.F.R. § 416.920. Step one asks if the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). Step two asks if the claimant's impairment is "severe." § 416.920(a)(4)(ii). Step three asks if the impairment appears in the "Listing of

20

Impairments," 20 C.F.R. Part 404, Subpart P, App. 1, and meets the duration requirement. § 416.920(a)(4)(iii). Step four asks if the claimant can still do "past relevant work." § 416.920(a)(4)(iv). Step five asks if the claimant "can make an adjustment to other work." § 416.920(a)(4)(v).

## C. The Commissioner's Disability Determination Is Supported by Substantial Evidence

The ALJ evaluated Plaintiff's claim pursuant to the sequential evaluation regulations and found that Ramirez had not engaged in substantial gainful activity since his application date, that Plaintiff's chronic headaches and degenerative disc and joint disease were "severe" pursuant to 20 C.F.R. § 420(c), and that Plaintiff's impairment or combination of impairments did not meet the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1. At the fourth step of the sequential evaluation, the ALJ found that despite his impairments, Ramirez did have the residual functional capacity to perform light work that did not require exposure to unprotected heights, dangerous machinery, or climbing ladders or scaffolds, and concluded that Plaintiff could perform his past work as a car wash attendant. See

20 C.F.R. § 416.920(e). The ALJ therefore concluded that
that Plaintiff was not disabled.

The ALJ's conclusion that Ramirez was able to
perform a reduced range of light work was supported by
substantial evidence, most notably through the extensive
medicals reports included in the record. With respect to
Plaintiff's hypertension, Dr. Valdes, Plaintiff's treating
physician, described the condition as "controlled." His
blood pressure readings were generally in the normal or
mild hypertension range,[2] and absent medical evidence
linking the condition to his complaints of pain, the
Commissioner was warranted in concluding that Plaintiff's
hypertension was not disabling. See Dumas v. Schweiker,
712 F.2d 1545, 1552—53 (2d Cir. 1983).

Similarly, the record contains substantial
evidence that Ramirez's aneurysm, for which Plaintiff
underwent two surgeries, did not prevent him from
performing his past relevant work. Following his first
surgery, Dr. Niimi reported that Plaintiff was "doing well"
and had only mild remaining headaches, which were being

---

[2] According to the Commissioner, "normal" blood pressure is no higher
than 130/85 and mild hypertension is no higher than 159/99.

controlled with over-the-counter medication. Dr. Niimi
also told Ramirez at that time that he could start working.
Five months later, Dr. Niimi again reported that Ramirez
was "doing very well" with complaints of only minor
headaches.

Although Dr. Niimi described Plaintiff as having
recovered well from the surgery, a subsequent angiogram and
MRI showed remnants of the aneurysm, and a second surgery
was performed by Dr. Langer on July 28, 2006. Although
Ramirez was diagnosed with aseptic meningitis in early
August 2006, by the time of an August 23, 2006 examination
by Dr. Langer, Plaintiff was doing well with only mild
residual headaches. At that time, Dr. Langer reported that
Plaintiff had "no deficit related to his surgery," and that
he had "done quite well."

In connection with Ramirez's complaints of back
and leg pain, the record included a 2006 report from Dr.
Valdez stating that Plaintiff's extremities were normal,
and that Plaintiff was asymptomatic. In May 2006, in
response to Ramirez's complaints of numbness in his left
upper extremity with mild pain, occasional right leg pain,
and "vague fatigue," Dr. Langer's neurological evaluation

23

was essentially normal with no evidence of memory loss or cognitive deficits. Similarly, Dr. Florimon's September 2006 examination findings were, for the most part, unremarkable. That same month, Dr. Puri examined Ramirez and noted that Ramirez did not have any objective functional limitations.

By December 29, 2006, Dr. Langer reported that Plaintiff was "doing beautifully" and had no residual deficits. Ramirez was taking only Ibuprofen for pain, and Dr. Langer was encouraging Plaintiff to return to work. In February 2007, Dr. Niimi reported that Plaintiff had no neurological problems and only occasional headaches.

In addition to reports by examining physicians, Dr. Nobel, a state agency physician, also opined that, as a result of his condition, Plaintiff's limitations were relatively mild. Specifically, Dr. Nobel concluded that Ramirez was not significantly limited in his ability to engage in many simple tasks that would permit him to be employed in a light work position. Although generally, an ALJ will "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]," 20 C.F.R. §

24

416.927(d), the opinion of a state agency physician such as Dr. Nobel is entitled to considerable weight where, as here, it is consistent with other medical evidence of record. See 20 C.F.R. § 416.927(f).

The opinion of Dr. Cohen, the medical expert who testified at the hearing, also supported the ALJ's determination that Ramirez had the residual functional capacity for a restricted level of light work. According to Dr. Cohen, both of Plaintiff's surgeries were successful. With respect to Plaintiff's complaints of back pain, Dr. Cohen noted that while 2006 X-rays showed degenerative disease of the spine, the records did not show any clinical or diagnostic evidence of radiculopathy, and pointed to a number of neurological examinations in the record that were normal and which did not document any sensory abnormality, reflect deficit, or weakness. Dr. Cohen further testified that Ramirez's condition did not meet the requirements of any listed impairment for a continuous twelve-month period and that Plaintiff had only mild functional limitations.

Taken together, the medical evidence[3] supports the

Commissioner's conclusion that Ramirez could perform

simple, routine, light work.

The ALJ also considered Ramirez's subjective

complaints of pain, numbness, and functional limitations,

ultimately concluding that his complaints were not credible

to the extent alleged. Under the Act,

> [a]n individual's statement as to pain
> or other symptoms shall not alone be
> conclusive evidence of disability as
> defined in this section; there must be
> medical signs and findings, established
> by medically acceptable clinical or
> laboratory diagnostic techniques, which
> show the existence of a medical
> impairment that results from
> anatomical, physiological, or
> psychological abnormalities which could
> reasonably be expected to produce the
> pain or other symptoms alleged and
> which, when considered with all
> evidence required to be furnished under
> this paragraph (including statements of
> the individual or his physician as to
> the intensity and persistence of such
> pain or other symptoms which may
> reasonably be accepted as consistent
> with the medical signs and findings),
> would lead to a conclusion that the
> individual is under a disability.

---

[3] The ALJ also correctly considered, but rejected, the conclusions of
Dr. Meadow that Plaintiff had OBS and a learning disability, as
inconsistent with Plaintiff's treating doctors who did not report any
such findings. See 20 C.F.R. § 416.927(d)(2) (mandating that greater
weight be accorded to treating physician opinion).

26

42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.929; Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983). Where the claimant's symptoms suggest a greater restriction of function than can be demonstrated by objective evidence alone, consideration is given to such factors as: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and adverse side-effects of medication that the claimant has taken to alleviate his symptoms; 5) treatment, other than medication, which the claimant receives or has received for relief of pain or other symptoms; 6) any other measures which the claimant uses or has used to relieve his pain or other symptoms; and 7) other factors concerning functional limitations and restrictions due to pain. See 20 C.F.R. § 404.1529(c)(3). After weighing the objective evidence, the claimant's demeanor, and other indicia of credibility, it is for the ALJ to resolve conflicting evidence, and it is within his authority to discredit a claimant's subjective estimate of the degree of an impairment. See Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985).

Here, the ALJ considered Plaintiff's allegations of pain and determined that they were not fully credible. Although the ALJ accepted Plaintiff's allegations of chronic headaches, he concluded that they were less severe than Plaintiff alleged, as demonstrated by records from Plaintiff's treating sources. Shortly after the first surgery in August 2005 and again in early 2006, the record contains medical evidence that Plaintiff was able to control his headaches with Advil, an over-the-counter medication. After the second surgery, it was reported that Ramirez had only occasional headaches.

With respect to Plaintiff's complaints of back and leg pain, the ALJ found a lack of physical findings to support Plaintiff's subjective complaints. While X-rays were suggestive of disc disease, physical examination findings were almost uniformly normal. Dr. Cohen evaluated the records and testified that the records did not show any clinical or diagnostic evidence of radiculopathy and specifically noted that there were a number of neurological examinations in the record which all were normal.

Substantial evidence also supported the ALJ's finding that Ramrirez's impairments did not prevent him

28

from performing his past light work as a car wash attendant. Fass-Karlin offered testimony as a vocational expert witness characterizing the job of car wash attendant as light, unskilled work as it was generally performed in the national economy, and stated that, as Plaintiff had performed it, it was a medium job. The expert testified that the car wash attendant job did not require more than occasional kneeling and crawling, and did not involve unprotected heights, ladders, scaffolds, or dangerous machinery.

In evaluating whether a claimant possesses the capacity to work at a past relevant job, the ALJ can consider either the job as the individual actually performed it or as it is generally performed in the national economy. Jaskinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003). To meet his burden of establishing disability, Ramirez was required to establish that his impairments prevent him from returning to his former type of work. See Jock v. Harris, 651 F.2d 133, 135 (2d Cir. 1981).

In this case, the ALJ found that Plaintiff retained the capacity to perform simple, routine light work

that did not require exposure to dangerous machinery, unprotected heights, ladders or scaffolds. None of the evidence in the record, other than Plaintiff's allegations of pain, appears to prevent him from meeting the physical and mental demands of his past relevant unskilled work as car wash attendant as it is generally performed in the national economy.

After evaluating the evidence of record, the Commissioner determined that Plaintiff failed to sustain his burden of proof that he was under a disability within the meaning of the Act. The Court concludes that the Commissioner's determination was reasonable and is affirmed under the substantial evidence rule. 42 U.S.C. § 405(g).

**Conclusion**

The Commissioner's motion is granted and his decision affirmed. Accordingly, the complaint is dismissed.

Submit judgment on notice.

It is so ordered.

30

New York, N.Y.
July  29  , 2009

ROBERT W. SWEET
U.S.D.J.